WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Rafford Hayden, | No. CV-14-02358-TUC-BPV |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Sara Rafford Hayden has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. (Doc. 9).  Pending before the Court are Plaintiff's Opening Brief (Doc. 14), Defendant's Brief (Doc. 15), and Plaintiff's Reply Brief (Doc. 18).  For the following reasons, the Court remands this matter for further proceedings.

## I.  PROCEDURAL HISTORY

On July 14, 2011, Plaintiff protectively filed an application for disability insurance benefits under the Social Security Act. (Transcript/Administrative Record (Doc. 11) ("Tr.") 10, 164-65).  Plaintiff alleges that she has been unable to work since January 20, 2010[1] due to major depressive disorder, inability to concentrate, difficulty retaining new information, rheumatoid arthritis ("RA"), neck pain, and Sjogren's Syndrome.  (Tr. 29, 177).

---

[1] Plaintiff initially indicated a disability onset date of September 24, 2009, however, she later amended her alleged disability onset date to January 20, 2010.  (*See* Tr. 10, 164).

After Plaintiff's application was denied initially and on reconsideration (Tr. 79, 97), the matter proceeded to hearing before Administrative Law Judge George W. Reyes ("ALJ"), where Plaintiff and vocational expert ("VE") Ruth Van Vleet testified.  (Tr. 25-71).  On April 1, 2013, the ALJ issued his decision finding Plaintiff was not disabled under the Social Security Act.  (Tr. 7-19).  The Appeals Council subsequently denied Plaintiff's request for review, thereby rendering the ALJ's April 1, 2013 Decision the final decision of the Commissioner.  (Tr. 1-5).  Plaintiff then filed this action.

## II.     PLAINTIFF'S BACKGROUND AND STATEMENTS IN THE RECORD

Plaintiff was born in July 1963.  (Tr. 164).  She has completed four or more years of college and last worked in 2008 as a research director for a newspaper.  (Tr. 178, 201).  Prior to working as a research director, she worked as an associate editor and editor in the magazine industry, an exhibitor services manager, a research director for a newspaper, and in advertising and design.  (*Id.*).  In about 2011, Plaintiff moved from California to Arizona to spend more time with her father who was ill.  (Tr. 35).

Plaintiff states that she is unable to work because she "feel[s] like she has brain damage.  My brain just doesn't connect the dots the way it did.  I have extreme difficulty reading and writing.   It's very difficult to concentrate and to focus."  (Tr. 30-31).  Plaintiff is forgetful and has difficulty completing tasks and following conversations and television shows.  (Tr. 58, 192).  She spends most of her time in bed watching television.  (Tr. 193).  She occasionally goes to the store but meals are sporadic.  (*Id.*).  She bathes about twice a month and usually wears the same clothing more than one day.  (Tr. 194).  She stopped going to her book club, lectures, the library, and the book store.  (Tr. 197).  She uses Skype to talk to her friends (Tr. 196) and "sometimes do[es] email but that takes an unreasonable amount of time."  (Tr. 193). "Once in a while I visit in person." (Tr. 196).

Plaintiff also experiences nausea and her RA causes pain and numbness in her hands extending to her forearms and elbows.  (Tr. 33, 36; *see also* Tr. 47 (RA causes swelling in her wrists), 57 (pain in wrists, hands and fingers limits typing and other

1   activities)).  She also experiences back pain.  (Tr. 571).  To treat her RA, Plaintiff goes to
2   the hospital once a month for a two-hour IV infusion of Orencia and she self-administers
3   injections of Methotrexate.  (Tr. 49).    Additionally, at times, Plaintiff must undergo
4   steroid injections for localized swelling.  (Tr. 50-51).  About two or three days after the
5   steroid injections, Plaintiff's mood changes and she "can get suicidal."  (Tr. 51).

6   ## III.    THE ALJ'S DECISION

7   ### A.    CLAIM EVALUATION

8       Whether a claimant is disabled is determined pursuant to a five-step sequential
9   process.  See 20 C.F.R. §§404.1520.  To establish disability, the claimant must show: (1)
10  she has not performed substantial gainful activity since the alleged disability onset date
11  ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her
12  impairment(s) meets or equals the listed impairment(s) ("Step Three").  "If the claimant
13  satisfies these three steps, then the claimant is disabled and entitled to benefits.  If the
14  claimant has a severe impairment that does not meet or equal the severity of one of the
15  ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to
16  determine the claimant's residual functioning capacity[2]….After developing the RFC, the
17  ALJ must determine whether the claimant can perform past relevant work…. If not, then
18  at step five, the government has the burden of showing that the claimant could perform
19  other work existing in significant numbers in the national economy given the claimant's
20  RFC, age, education, and work experience."  *Dominguez,* 808 F.3d at 405 (citations
21  omitted).

22  ### B.    The ALJ's Findings in Pertinent Part

23      The ALJ found that Plaintiff had the following severe impairments: rheumatoid
24  arthritis; Sjogren's syndrome; cervical spine degenerative disc disease; lumbar spine
25  degenerative disc disease; gastritis; and obesity.[3]  (Tr. 12).  He also found that Plaintiff's

26      [2] Residual Functioning Capacity ("RFC") "is defined as 'the most' the claimant
27  can do, despite any limitations."  *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015),
    *as amended* (Feb. 5, 2016) (citation omitted).

28      [3] The ALJ's decision reflects that Plaintiff weighed approximately 199 pounds and

"depression, considered singly and in combination,…is…nonsevere." (Tr. 12). The ALJ assessed Plaintiff's RFC as follows:

> The claimant retains the capacity to lift and carry 20 pounds occasionally, and 10 pounds frequently; stand and walk for 6 hours in an 8 hour workday; sit for 6 hours in an 8 hour workday; pushing is commensurate with the aforementioned lifting and carry limitations; the claimant may frequently pull a weight commensurate with the aforementioned lifting and carrying limitations:  20 pounds occasionally and 10 pounds frequently; perform frequent handling and fingering; must avoid concentrated exposure to extreme cold and heat, extreme vibration, fumes, odors, dusts, gases and poor ventilation, or the like; avoid even moderate exposure to workplace hazards, such as unprotected heights or dangerous machinery; must not work in a fast-paced production environment; and is able to attend and concentrate for 2 hour blocks of time throughout an 8 hour workday with the two customary 10 to 15 minute breaks, and the customary 30 to 60 minute lunch period.

(Tr. 14; *see also* Tr. 16 (ALJ stating that Plaintiff "retains the capacity for up to a wide range of light exertion work activity.")).

Citing the VE testimony, the ALJ determined that Plaintiff is capable of performing her past relevant work "as a journalist and research director.  This work does not require the performance of work related activities precluded by the claimant's [RFC]…." (Tr. 18; *see also* Tr. 60-61 (VE testimony that research director is sedentary work and journalist is light work)).  Therefore, the ALJ determined that Plaintiff has not been under a disability as defined in the Social Security Act from January 20, 2010, through the date of his decision.  (Tr. 19).

## IV.   DISCUSSION

Plaintiff argues that: (1) the ALJ's finding that Plaintiff was not credible was in error; (2) the ALJ erred in rejecting her treating doctors' opinions in favor of the nonexamining doctors' opinions; (3) the ALJ failed to provide a proper basis for finding the third party statement was not credible; and (4) the ALJ's decision that Plaintiff could perform her past relevant work was not based on substantial evidence.  Defendant counters that the ALJ's decision was free of error on all matters at issue.

---

is 64 inches tall.  (Tr. 16).

### A.   STANDARD

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).   The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).   Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).   Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Matney,* 981 F.2d at 1019.  However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"   *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)).   Rather, the Court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

### B.   PLAINTIFF'S CREDIBILITY

Plaintiff takes issue with the ALJ's finding that although her impairments could reasonably be expected to cause the symptoms she complained of, her statements

concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. 15).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing, which "is the most demanding [standard] required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *see also   Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (reaffirming that the "clear and convincing" standard applies in such cases). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).  In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms or between testimony and conduct, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and   functional restrictions caused by the symptoms. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Orn*, 495 F.3d 636; *Robbins v. Comm'r of Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006); *Smolen*, 80 F.3d at 1284.

In concluding that Plaintiff was not fully credible, the ALJ cited Plaintiff's frequent travel between Arizona and California, improvement with medication, that

1    medical records did not indicate that Plaintiff was in "acute or apparent distress", lack of

2    side-effects from medication that would interfere with the ability to work, and that she

3    exercised, participated in court hearings and Skyped with her psychologist or psychiatrist.

4    (*See* Tr. 16-17).

5          With regard to travel between Arizona and California, the record reflects that after

6    Plaintiff moved from California to Arizona in 2011 (Tr. 35), she continued to see many

7    of her treating doctors located in California including her rheumatologist Dr. Barry,

8    psychiatrist Dr. Smith, and Dr. Lim at Redwood Pulmonary Medical Associates, because

9    the doctors were familiar with her conditions and complications including bad reactions

10   to medications.  (*See* Tr. 52-53).  At the February 2013 hearing before the ALJ, Plaintiff

11   testified that: between June 2011 through the end of that year, she "think[s]…" she

12   traveled to California five times; in 2012, she traveled to California four times; and in

13   2013, she traveled to California about once every three or four months by airplane and

14   she stayed with her cousin who picked her up at the airport.  (Tr. 35 (she normally travels

15   to California by airplane); Tr. 41).  In discounting Plaintiff's credibility, the ALJ cited

16   2012 treatment notes from Dr. Lim indicating Plaintiff's report that she traveled from

17   California to Arizona "weekly" (Tr. 623) and "frequently" (Tr. 620).  (Tr. 17 & n.1

18   (citing Tr. 620, 623)).  According to the ALJ, Plaintiff's "prior admissions to her

19   physician [Dr. Lim] contradict her testimony and thus substantially reduce her

20   credibility." (*Id.*).  The ALJ also stated that Plaintiff was able to drive a car for two days

21   to Arizona.  (Tr. 17 (citing Tr. 813)).

22         In support of the ALJ's finding, Defendant cites 2012 records from California

23   providers indicating Plaintiff's presence in California for an emergency room visit,

24   laboratory testing, and appointments on January 14 and 17, February 10, March 9, May

25   14 and 15, June 25 and 28, July 24, October 9, and December 14, 18 and 19.  (Doc. 15, p.

26   5).  Plaintiff counters that she saw her doctors in California as often as they requested her

27   to be seen and she scheduled her appointments close together.  (Doc. 18, p. 5).  She

28   points out that the dates cited by Defendant are consistent with a grouping of medical

visits during an extended stay four to five times in 2012. (*Id.*; *see also see also* Tr. 46-47 (Plaintiff testified that she was in California in 2012 "right before Christmas)…[for] [a]bout a week.")). Plaintiff also points to other errors in Dr. Lim's notes to undermine the ALJ's decision to make Dr. Lim's notes "the cornerstone of his credibility finding[]", especially when there is no showing that the frequency of Plaintiff's travel had any bearing on Dr. Lim's treatment. (Doc. 14, pp. 13-14).

Inconsistencies in a claimant's statements can impact the credibility determination. It can be said that Plaintiff traveled several times a year between Arizona and California, which is essentially what she testified to doing. The records cited by Defendant do not support the finding that Plaintiff traveled to California on a weekly basis in 2012. Notwithstanding Dr. Lim's apparently errant note, the substantial evidence of record does not support a clear and convincing finding that Plaintiff traveled to California on "a weekly basis[]." (Tr. 17). Moreover, Plaintiff's statement in December 2012 that she drove for two days from Arizona to California does not necessarily undermine her credibility given that she made this statement upon presentation for treatment of neck pain after making that drive. (Tr. 813). Nor is there any other instance to support a conclusion that Plaintiff made that drive on a regular basis. Instead, Plaintiff testified that she normally flew to California. (Tr. 35).

While the ALJ acknowledged that Plaintiff's compliance in taking medications weighed in her favor, he noted that her medications have been relatively effective in controlling her symptoms and that any side effects would not interfere with her ability to perform work activities in a significant manner. (Tr. 17). The ALJ also stated that although Plaintiff "alleged disabling pain, progress notes frequently show she was in no acute or apparent distress." (Tr. 17 (citing Tr. 620, 623, 654, 658, 743, 747, 750, 753, 758, 761, 764, 766, 770, 773, 778)). Plaintiff testified that to treat her RA, she goes to the hospital once a month for a two-hour IV infusion of Orencia and she self-administers injections of Methotrexate. (Tr. 49). Additionally, at times, Plaintiff must undergo steroid injections for localized swelling and have fluid aspirated. (Tr. 50-51). About two

or three days after the steroid injections, Plaintiff's mood changes and she "can get suicidal." (Tr. 51). Further, the Orencia and Methotrexate suppresses her immune system which leaves her susceptible to infection. (*Id.*). If she gets a cold, she must stop taking the medications and her pain increases. (TR. 52). She testified that in the past two to three years, she has had to go off her medications six or seven times because of infections. (*Id.*). Plaintiff also testified that when she reports to her doctor that she is "doing okay with" her RA, she means:

> Probably that there's nothing new and wild coming at me and that it's just pretty much status quo….[T]hat I don't have anything out of the ordinary to complain to my doctor about, so if I'm having a flare I wouldn't necessarily say that to my doctor because I've had so many of them in the past and I know what they would say with what to deal with and I know what the protocol is to take care of that and that's it's eventually going to go away.

(Tr. 50).

The record reflects that Plaintiff is on a host of medications including: Orencia, Methotrexate, leflurnonide (Arava), Aleve, Dexilant, fentanyl extended release patch, Ambien, bupropion, Cymbalta, folic acid, leucovorin, MiraLax, Synthroid, Taztia, hydrocodone, Zofran, promethazine, and lorazepam (Ativan). (Tr. 654). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). To support the finding that Plaintiff's medications were effective in controlling her symptoms, the ALJ cites three treatment notes, the earliest of which is dated September 22, 2011, when Plaintiff presented to Patel Medical Clinic to establish a treatment relationship with a primary care physician in Arizona. (Tr. 776). Plaintiff reported doing well on her current regimen for RA and that with regard to depression, she "den[ied] any depressive symptoms" and stated she was doing well on Wellbutrin. (Tr. 776, 779). The ALJ also cited a July 24, 2012 treatment note by Dr. Lim, who was treating Plaintiff for pulmonary issues, noted that Plaintiff's pleurisy was no longer problematic and that Plaintiff's "current immunosuppressive regimen has been working very well to control her rheumatoid symptoms." (Tr. 624). The final note cited

by the ALJ was from a January 3, 2013 examination with Dr. Maricic, the rheumatologist who oversaw Plaintiff's Orencia infusions in Arizona, noting that Plaintiff was "doing fairly well in terms of her RA, although she still has some synovitis [in her left wrist and MCPs bilaterally] on exam."  (Tr. 655).  Dr. Maricic also noted that Plaintiff experienced morning stiffness anywhere from two minutes to one hour and that she is able to attend to her activities of daily living.  (Tr. 654).

By focusing on the three cited treatment notes, the ALJ overlooked that despite Plaintiff's medication regimen, she presented: in June 2011 with limited range of motion secondary to arthritis (Tr. 383); in October 2011 with a flare causing swelling and pain in her hands and knee pain (Tr. 379);  in November 2011 with complaints of diffuse swelling and redness in her hands signifying "RA exacerbation" (Tr. 768 (November 22, 2011); *see also* Tr. 765 (on November 17, 2011, Plaintiff presented with an acute flare up of moderately severe RA); Tr. 767 (injection administered on November 22, 2011); Tr. 770 (injection administered on November 17, 2011)); in May 2012, with pain noted in the paraspinal muscles of the lumbar spine and bilateral sacroiliac joints, worse on the right side (Tr. 761 (on May 4, 2012 Plaintiff also presented as anxious); Tr. 758 (May 31, 2012)); also in May 2012, for right knee fluid aspiration upon complaints of knee pain (Tr. 817); in June 2012 with mild synovitis in her hands and knee swelling and pain requiring fluid aspiration and an injection (Tr. 816); in July 2012 with puffy wrists requiring fluid aspiration (Tr. 815); in September 2012 with reports of morning stiffness and increased pain during the past month in her wrists, MCPs and knees with exam showing synovitis in the wrists and MCPs and tenderness in the metatarsal head bilaterally  (Tr. 658-59); and in December 2012 for left knee aspiration. (Tr. 812).

As for the ALJ's citation to records indicating either "no acute or apparent distress" or not mentioning the issue of distress, such records do not undermine Plaintiff's allegations given that the notes essentially show that Plaintiff received treatment for the symptoms about which she complained, nor is there any indication that the providers questioned Plaintiff's credibility with regard to the reason why she presented for

treatment on the particular occasion or for any other reason.  The treatment notes support Plaintiff's complaints of nausea (Tr. 620; Tr. 741-43; Tr. 747); abdominal pain (Tr. 741-43 (mild epigastric tenderness on exam); Tr. 678; Tr. 747; Tr. 750-53 (same and also noting vomiting)); facial pressure and pain in teeth and exam finding of sinus tenderness (Tr. 771-73 (diagnosis of sinusitis for which Levaquin was prescribed)); joint swelling and pain (Tr. 620 -55 (mild hand swelling noted on exam); Tr. 654 (reported pain scale of 3/10 and trace synovitis of left wrists and MCPs bilaterally along with tenderness in metatarsal head bilaterally); Tr. 658-59 (reported pain scale of 6/10 and finding of synovitis); Tr. 765 (acute flare up of RA affecting both wrists, ankle joints and right knee, requiring injection); Tr. 768-770 (upon examination bilateral hands show erythema and diffuse edema, Plaintiff "states she is miserable.")); musculoskeletal pain (Tr. 758 (on examination pain noted in paraspinal muscles of the lumbar spine and in bilateral sacroiliac joints worse on the right side); Tr. 761 (on examination pain noted in paraspinal muscles of the lumbar spine and in bilateral sacroiliac joints worse on the right side); Tr. 764 (on examination pain noted in paraspinal muscles of the lumbar spine and in bilateral sacroiliac joints worse on the right side and Vicodin was refilled and Valium was also prescribed)); and shortness of breath (Tr. 761 (noting that Plaintiff appeared anxious although she denied anxiety); Tr. 623-24 (diagnoses included chest discomfort and bronchodilators were prescribed)).

With regard to side-effects, Plaintiff testified that she has experienced esophagitis, nausea, sleepiness, and drowsiness.  (Tr. 44).  Upon further questioning by the ALJ about a 2013 treatment note from treating psychiatrist Dr. Smith that Plaintiff reported no side-effects (Tr. 45 (citing Tr. 638)), Plaintiff testified that she experienced the nausea and vomiting in 2009 (Tr. 45). A November 4, 2009 treatment note from Dr. Smith indicates "Little [illegible]…low dose Cymbalta, but so far were tolerated."  (Tr. 243). Also, in 2010, Dr. Smith noted that "Ambien is causing cognitive [illegible]."  (Tr. 242). In 2012, Dr. Smith noted Plaintiff's complaint that she "feel[s] nauseous a lot.  May start new medication for [nausea]."  (Tr. 639).

The record also reflects that in January 2009, Dr. Lim suspected that depression and Plaintiff's "many   medications…may be contributing to…" her "complaints about mental capacity and focus."  (Tr. 563 (noting that Plaintiff "is sensitive to medications [sic] side effects.")).   In 2010, endocrinologist Elizabeth Fraze, M.D., wrote that Remicade caused drug-induced lupus and that Plaintiff experienced adrenal suppression secondary to frequent steroid injections.  (Tr. 234).  Dr. Fraze also mentioned Plaintiff's report that steroid injections, while helpful to her joints, cause a number of side-effects including insomnia, agitation, and fatigue. (*Id.*).   Plaintiff also told Dr. Fraze that Cymbalta initially caused fatigue, but it had resolved.  (Tr. 235). Also in 2010, Drs. Barry and Smith suspected that Cymbalta was causing a flare in Plaintiff's RA, but then ruled that out.  (Tr. 241-42, 401; *see also* Tr. 823-24 (during this period Plaintiff was taken to the ER upon possible reaction to tapering Cymbalta and taking Tramadol, which resulted in vomiting, shakiness and diaphoresis)).   The substantial evidence of record supports Plaintiff's statement that she has suffered side effects from her medication.

To further discount Plaintiff's credibility, the ALJ pointed out that "[s]he walks for exercise, and one physician has encouraged her to diet and exercise more."  (Tr. 17).  He also cited Plaintiff's testimony that she had "once weighed much more than 200 pounds, but had lost weight and now weighed 190 pounds."  (*Id.*; *see also* Tr. 12 (ALJ found Plaintiff's severe impairments included obesity)). Plaintiff's exercise is not inconsistent with her statement that she can walk up to 45 minutes before she needs to rest.   (Tr. 197). The ALJ does not explain how Plaintiff's exercise diminishes her credibility or how Plaintiff's activities of daily living, as she described them, translated into the ability to carry out full time work functions. On this record, Plaintiff's exercise pursuant to doctor's orders does not undermine her credibility.  *See e.g. Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in

order to be disabled.").

The ALJ also found Plaintiff's credibility was diminished because she "participated in court hearings and Skypes regularly with her psychiatrist or psychologist." (Tr. 17). The record reflects that Plaintiff was involved in disability discrimination litigation against her former employer regarding her termination by new management in 2008. (Tr. 38). Plaintiff testified that the suit was settled in November of that same year and no hearings or depositions were involved. (Tr. 39, 41). The ALJ pointed to nothing about the 2008 litigation that would impact Plaintiff's credibility. Instead, that litigation occurred prior to her alleged disability onset date and has no bearing on this case.

After Plaintiff's mother passed away, litigation arose apparently concerning a probate issue. (*See* Tr. 37-38, 41). Plaintiff testified there was one hearing concerning that issue. (Tr. 41). There was no discussion about the length of the hearing or any other factor that would indicate that Plaintiff's ability to attend that hearing was inconsistent with, or otherwise undermined, her allegations.

Plaintiff's psychologist, Dr. Furze, is located in California. (Tr. 32 (Plaintiff has been seeing Dr. Furze for about seven or eight years)). Plaintiff's appointments with Dr. Fruze last about 50 minutes each and occur about twice a week over Skype. (*Id.*). No reason has been proffered by the ALJ to support the finding that Plaintiff's credibility is diminished because she sees her psychologist over Skype.

At bottom, the reasons cited by the ALJ for discounting Plaintiff's credibility either are not supported by the substantial evidence of record or otherwise do not provide a basis to disbelieve Plaintiff. The ALJ has failed to state clear and convincing reasons to reject Plaintiff's credibility.

## C.   TREATING PROVIDER OPINIONS

Plaintiff challenges the ALJ's decision to give significant weight to the nonexamining doctors' opinions and to "assign[] little weight" to the opinions of Plaintiff's treating rheumatologist Dr. Barry, psychiatrist Dr. Smith, and psychologist Dr.

Furze,.  (Doc. 14, p. 5).  According to Plaintiff, the treating doctors' opinions, taken separately or together, established her inability to perform full-time work.  (*Id.*).  Defendant counters that the ALJ provided sufficient reasons to discount the treating doctors' opinions.

It is well-settled that the opinions of treating doctors are entitled to greater weight than the opinions of examining or nonexamining doctors.  *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995). Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating doctors are accorded special weight because treating doctors are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to []substantial weight.[]") (internal quotation marks and citation omitted); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989) ("We afford greater weight to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")(internal quotation marks and citation omitted); 20 C.F.R 20 § 404.1527 (generally, more weight is given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations….").

A treating doctor's opinion may not be entitled to controlling weight where it is not "well-supported" or  inconsistent with other substantial evidence in the record. *Orn,* 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(2)). In such a case, the ALJ must

consider the factors outlined in the regulations in determining what weight to accord the treating doctor's opinion.[4]  *Id* at 631-32; *see also* Social Security Ruling 96-2p, 1996 WL 374188, *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR §§ 404.1527 and 416.927.") Importantly,  even if the treating doctor's opinion does not meet the test for controlling weight, that opinion may still be entitled to the greatest weight and should be adopted. *Orn,* 495 F.3d at 632 (quoting SSR 96-2p, 1996 WL 374188, *4).

An ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and convincing' reasons supported by substantial evidence in the record." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record."  *Reddick,* 157 F.3d at 725 (citing *Lester,* 81 F.3d. at 830).  "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof,

---

[4] The factors for consideration as to the weight the opinion will be given include

the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. [20 C.F.R.] § 404.1527(d)(2)(i)-(ii)….Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(d)(3)-(6).

*Orn*, 495 F.3d at 631.

and making findings.'" *Tommasetti* 533 F.3d at 1041 (quoting *Magallanes,* 881 F.2d at 751).   As discussed in further detail below, the ALJ accorded more weight to the nonexamining doctors than he did to Plaintiff's treating doctors.   When a non-treating physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the non-treating physician are not "substantial evidence."   *Orn*, 495 F.3d at 632-33; *see also Lester*, 81 F.3d at 831 (the opinion of a nonexamining doctors cannot by themselves "constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.") (emphasis in original). "When a nontreating physician's opinion contradicts that of the treating physician—but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician—the opinion of the treating physician may be rejected only if the ALJ gives 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Morgan v. Comm'r of Soc. Sec.,* 169 F.3d 595, 600 (9th Cir. 1999 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995) (other citations omitted); *see also Orn,* 495 F.3d at 632.

With regard to Plaintiff's physical impairments, the ALJ gave "substantial weight" to the opinions of state agency nonexamining  Drs. Disney and Goodrich who opined that Plaintiff retained "the capacity to perform light exertion work with frequent pulling, frequent bilateral handling and fingering, avoiding concentrated exposure to extreme heat and cold, vibration and fumes, odors, dusts, gases and poor ventilation, and avoid even moderate exposure to workplace hazards."   (Tr. 18).   With regard to Plaintiff's allegations of mental impairment, the ALJ gave "substantial weight" to the opinions of state agency nonexamining Drs. Salk, Ph.D., and Marks, M.D., who "opined the claimant has no functional limitations and that her depression is not severe."  (Tr. 14).  Plaintiff points out that the ALJ referred to the nonexamining doctors as state agency psychological or medical "consultants" to argue that the ALJ was under the mistaken impression that these doctors examined her, even though they did not.  (Doc. 14, p. 5). Defendant persuasively counters that, at best, the ALJ's mention of consultants was "a

harmless scrivener's error.  The ALJ does not indicate that these doctors personally evaluated Plaintiff; instead, he specifically acknowledges their review of the medical record." (Doc. 15, pp. 15-16).

Plaintiff argues that the nonexamining doctors' opinions cannot be considered substantial evidence because the record indicates that the nonexamining physicians mistakenly believed that her date last insured was December 31, 2011, which meant that "if the non-examining doctors did not find her disabled prior to that date, she would not be eligible for disability at all." (Doc. 14, p.5 (citing Tr. 79, 80, 88, 90, 94, 97, 98,107)). Further, the nonexamining doctors' record review also indicated that, presumably because the date last insured was in the past, a consultative examination was not possible. (*Id.* at p. 6 (citing Tr. 88, 94)).  At the hearing, Plaintiff's counsel informed the ALJ that there was "a mistake in the date last insured…" and that Plaintiff's date last insured was December 31, 2013, not December 31, 2011.  (Tr. 28).  The ALJ acknowledged that Plaintiff's date last insured was December 31, 2013. (*Id.*).

Plaintiff argues, and Defendant does not dispute, that the nonexamining doctors "did not write up any evidence after [December 31, 2011]…accept [sic] for one note in January 2012 (Tr. 108) and specifically bookmarked all records before that date.  (Tr. 108).  It is impossible to know if they reviewed any evidence after January 2012." (Doc. 14, p. 6; *see also* Doc. 15, p. 15).  Plaintiff contends that the mistake about the date last insured had "numerous implications" in that "[i]t set in the minds of the non-examining doctors an erroneous legal boundary.  It prevented them from looking at all the medical evidence.  It stopped them from obtaining a consultative examination when that might have shed light on her psychiatric impairments." (Doc. 14, pp. 6-7).  Defendant points out that "[e]ven if a doctor's opinion addresses only a portion of the alleged period of disability[,] it is still probative evidence about the claimant's functioning that an ALJ may consider[]", thus the state agency physician opinions that Plaintiff was not disabled as of December 31, 2011 remain worthy of weight.  (Doc. 15, p. 16).  Assuming that the state agency reviewing physicians limited their review to records generated on or before

January 2012 as Plaintiff posits, the ALJ's decision reflects that he considered records after January 2012. (*See e.g.* (Tr. 13 (citing medical records from throughout 2012); Tr. 14 (citing Exh. 28F (Tr. 781-83 (Dr. Furze's February 14, 2013 Mental Work Tolerance Recommendations), Tr. 652 (Dr. Smith's February 12, 2013 letter)); Tr. 15-16 (citing treatment records with dates after January 2012 and into January 2013)).

## 1. PLAINTIFF'S RA

In arriving at the RFC assessment, the ALJ accepted the limitations assessed by reviewing Drs. Disney and Goodrich[5], whose opinions he found were supported by the objective medical evidence showing that Plaintiff "had no neurologic deficits, and retained normal motor strength and a normal gait…." (Tr. 18). The ALJ also cited these same reasons to give the nonexamining doctors' opinions more weight than Plaintiff's treating rheumatologist, Dr. Barry. (*See id.* (giving "substantial weight" to the nonexamining doctors' opinion and giving "little weight" to Dr. Barry's opinion)). Plaintiff contends that none of the above-mentioned areas are indicative of disability resulting from RA. (*See* Doc. 14, p. 10 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.09 (Inflammatory arthritis)).[6] Although the Listing does not specifically include neurologic deficits or deficiencies as relevant to a finding of disability for this condition, it does mention the inability to ambulate effectively caused by joint inflammation or deformity, which, in essence, takes into account the ALJ's and reviewing doctor's reliance on the fact that Plaintiff's exams reflected normal gait. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.09(A)(1).

Upon a record review focusing on a December 31, 2011 date last insured, Drs. Disney and Goodrich concluded that Plaintiff was limited, *inter alia,* to frequent handling and fingering. (Tr. 93, 112). Dr. Goodrich noted that Plaintiff's history "supports

[5] Dr. Disney reviewed records upon Plaintiff's initial application and Dr. Goodrich reviewed records upon Plaintiff's request for reconsideration of the denial of her application. (Tr. 79, 108).

[6] Plaintiff does not contend she meets the Listing, instead, she cites to the Listing to support her argument that that the ALJ relied upon findings that have no relation to assessment of her impairment. (*See* Doc. 14, p. 10).

significant RA, but no good functional examinations." (Tr. 111). Both Drs. Goodrich and Disney noted that a consultative examination was not possible. (Tr. 90, 112). As discussed above, it is not entirely clear that the reviewing doctors considered records dated after December 31, 2011, in making their determination. In addition to other complaints associated with RA, Plaintiff presented with finger and hand pain and swelling in January and April 2010 (Tr. 406, 409-411), and hand and wrist pain and swelling in October and November 2011 (Tr. 379, 765, 768-70). Presumably these records were considered by the reviewing doctors given that they existed before December 31, 2011. Records from 2012 and 2013 show Plaintiff's continued complaints of wrist and hand pain and swelling, along with findings on examination of synovitis in her wrists and MCPs or puffiness in her wrists. (Tr. 658, 654-55, 815, 816). With regard to these latter records, the ALJ stated when assessing Plaintiff's credibility that "claimant has rheumatoid arthritis with hand and knee swelling….", and he mentions a January 2013 report showing "she had only trace synovitis of her left wrist with normal range of motion, and trace synovits [sic] of her fingers…." (Tr. 15 (citing Tr. 654-55). The ALJ's analysis overlooks Plaintiff's continued complaints of issues with her hands and wrists and, instead, focuses on one occasion. Plaintiff has testified that her RA symptoms includes flares. (*See* Tr. 50).

> The American Arthritis Association notes, "Rheumatoid arthritis is a chronic disease, meaning it can't be cured [,]" and some people have intermittent symptoms or "flares," while others have ongoing symptoms that worsen over time. See http://www.arthritis.org/types-what-is-rheumatoid-arthritis.php (visited 01/11/2012); *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 864 n. 1 (4th Cir. 2011) ("Rheumatoid arthritis is 'an inflammatory disease of the joints that causes the joints to swell and to stiffen. It is a chronic condition, permanent in nature.' ") (quoting *Moore v. J.B. Hunt Transp., Inc.,* 221 F.3d 944, 946 (7th Cir. 2000)); *see also Lowe v. Apfel,* 238 F.3d 429 (Table), 2000 WL 1290356, at *2 (9th Cir. Sept. 12, 2000) (Kleinfeld, C.J., dissenting) ("Rheumatoid arthritis, like chronic fatigue syndrome, is characterized by '[s]pontaneous remissions and exacerbations.'") (citation omitted).

*Salazar v. Astrue*, 859 F. Supp. 2d 1202, 1227 (D. Or. 2012).

Additionally, the jobs the ALJ determined that Plaintiff could perform required the

ability to frequently or occasionally finger and frequently handle, which comported with Drs. Disney's and Goodrich's assessments. *See Dictionary of Occupational Titles* §§ 131.262-018 (reporter), 132.037-022 (editor, publications). However, there is no showing on the instant record that the reviewing doctors would have assessed the same physical limitations had they been aware that Plaintiff's date last insured did not fall in 2011 but in 2013, thus enlarging the period for record review which included continued instances of hand and wrist pain and swelling concerning a claimant who the doctors already concluded, upon their limited review of the record, was restricted in handling and fingering. Further, there would have been time to obtain a functional evaluation—an assessment which reviewing Dr. Goodrich noted was lacking. "Different people may be affected by similar injuries in different ways. Different people have greater or lesser sensitivity to pain. Without a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual." *Penny,* 2 F.3d at 958.

Moreover, in arriving at his RFC assessment, the ALJ rejected the 2005 opinion from Dr. Barry, who has been Plaintiff's treating rheumatologist since 2002. In 2005, Dr. Barry wrote that she was presently treating Plaintiff "for rheumatoid arthritis and more recently chronic intermittent pleuritis." (Tr. 785). She went on to state that: Plaintiff's "disease is still active and does cause joint pain and chest pain intermittently, which may make it difficult for her to travel to and from work. I would recommend that, if possible, she be allowed to telecommute on an as-needed basis, perhaps one to two days per week, but certainly this would vary depending on how she responds to future treatments." (*Id.*). At the time, Plaintiff's employer instituted the accommodation which remained in place until new management took over in 2008 and refused to continue with the accommodation and terminated Plaintiff.[7] (Doc. 14, p. 10; *see also* Tr. 38-39). The VE

---

[7] Plaintiff testified that before new management took over, she did not keep a typical work schedule. (Tr. 56). Instead, she was permitted to work around doctor's appointments and her energy level to the extent that she would come to work later and work into the night, and she frequently worked on weekends. (*Id.*). While at work, she would need to stretch her back by lying on the floor. (Tr. 56-57). Additionally, when she used a keyboard, her hands and wrists would "get [a] very dull...ache [sic] pain and I would need to stop for a while....[T]hey'll get a little...more inflamed if I'm overdoing it

testified that Dr. Barry's recommendation would prevent Plaintiff from working anywhere except a specially accommodated position. (*Id.* (citing Tr. 67-68)). Plaintiff stresses that Dr. Barry never retracted her recommendation. (Doc. 18, p.4). She also points out that her "treatment continued to get more intensive requiring monthly infusions of a biologic agent [Orencia] at the hospital on top of self administered injections [Methotrexate]." (*Id.*). According to Plaintiff, "even in 2005 the doctor considered that the need for telecommuting days may change based on [Plaintiff's] responsiveness to treatment. It did change, it got worse." (*Id.*).

The ALJ gave Dr. Barry's opinion little weight finding it was "inconsistent with the objective medical evidence showing no neurologic deficits, normal motor strength and gait, and the claimant's relatively good activities of daily living including that she was able to travel 'frequently' between Arizona and California and even drive this distance. The frequency, and distance, of these trips shows the claimant has no difficulty traveling to and from work and does not need to telecommute one to two days per week or even on an as-needed basis." (Tr. 18). Defendant also argues that Dr. Barry did not actually assess any work limitations, instead, "[s]he merely stated that it 'may' be difficult for Plaintiff to travel and she 'recommend[ed]' allowing Plaintiff to telecommute." (Doc. 15, p. 15 (citing *Valentine v. Comm'r of Soc. Sec. Admin,* 574 F.3d 685, 691-92 (9th Cir. 2009) (where a doctor makes recommendations, but does not indicate that a claimant is incapable of working except under the recommended conditions, the ALJ does not err by excluding the recommended restrictions from the RFC assessment); *Carmickle v. Comm'r of Social Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir. 2008)).

Dr. Barry's letter is clear that when Plaintiff is in pain caused by RA and pleurisy, she should be permitted to telecommute. Unlike the "observation" in *Valentine* or the recommendation of a using a reclining chair as an alternative to a sit/stand option in *Carmickle,* Dr. Barry's letter was written for the direct purpose of indicating an

---

on a keyboard." (Tr. 57-58).

accommodation of functional limitations relating to Plaintiff's employment.  The record also supports the conclusion that the ALJ also considered Dr. Barry's letter as requiring a work accommodation.  (*See* Tr. 67-68).  As stated above, the ALJ's reliance on lack of evidence showing neurologic deficits and normal motor strength do not support the rejection of limitations caused by Plaintiff's RA. *See e.g. Orn,* 495 F.3d at 635 ("An ALJ may not exclude a physician's testimony for a lack of objective evidence of impairments not referenced by the physician.").  While evidence that Plaintiff had a normal gait may factor into an assessment under the Listing, here, there is no reason why having a normal gait would obviate the need to telecommute due to chest and joint pain, especially where Dr. Barry did not cite issues associated with walking as a reason for the restriction.  *See Orn,* 495 F.3d at 635.  Instead, consistent with Dr. Barry's letter, the record reflects Plaintiff's complaints of chest pain and joint pain primarily related to her upper extremities. Finally, the ALJ's reference to Plaintiff's travel between Arizona and California—which is addressed in more detail above when discussing the ALJ's rejection of Plaintiff's credibility—there is no suggestion on the instant record that Plaintiff was able to carry out full-time work immediately after such travel or that such travel occurred back and forth commensurate with travel necessary for full time work.  *See e.g. Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits…..").  The ALJ failed to state sufficient reasons to reject Dr. Barry's 2005 opinion.

## 2.    MENTAL IMPAIRMENTS

On February 12, 2013, Dr. Smith, Plaintiff's treating psychiatrist, wrote that Plaintiff met the Listing for 12.04, affective disorder. (Tr. 652).  Plaintiff bears the burden of demonstrating that she meets a listing.  To meet Listing 12.04, Plaintiff must show that she "meets at least *one* paragraph  A  criterion *and* at  least *two* paragraph  B criteria." *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1992) (citing 20 C.F.R. Pt.. 404, Subpt. P, App. 1 (emphasis in original)).[8]  As for paragraph A criteria, Plaintiff argues

---

[8] Pertinent  to  Plaintiff's  claim  are  the  following  requirements  set  out  in  the

that her records document pervasive loss of interest; appetite disturbance with change in weight (weight gain); sleep disturbance; psychomotor retardation; and difficulty concentrating or thinking.  (Doc. 18, p. 2). With regard to the Paragraph B criteria, she argues that "Dr. Smith documents the necessary criteria…."  (*Id.*).

Psychologist Cynthia T. Furze, Ph.D., wrote an undated letter stating that she had been treating Plaintiff for depression since 2008[9] and that within the course of eighteen months "multiple and cumulative traumas…", including Plaintiff's 2008 termination, Plaintiff underwent surgery[10], her mother's diagnosis with and death from brain cancer,

Listing:
> A.   Medically documented persistence, either continuous or intermittent, of one of the following:
>> 1.   Depressive syndrome characterized by at least four of the following:
>>> a. Anhedonia or pervasive loss of interest in almost all activities; or
>>> b. Appetite disturbance with change in weight; or
>>> c. Sleep disturbance; or
>>> d. Psychomotor agitation or retardation; or
>>> e. Decreased energy; or
>>> f. Feelings of guilt or worthlessness; or
>>> g. Difficulty concentrating or thinking; or
>>> h. Thoughts of suicide; or
>>> i. Hallucinations, delusions, or paranoid thinking….
> AND
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.   Repeated episodes of decompensation, each of extended duration….

20 C.F.R. Pt. 404, Subpart P, App. 1, §1204.

A claimant can also meet Listing 12.04 by satisfying Paragraph C. *Id.* Plaintiff does not assert that Dr. Smith's notes support a finding that she satisfies Paragraph C, she instead focuses on Paragraphs A(1) and B. (*See* Doc. 18, p. 2 & nn. 2, 3).

[9] Another undated letter from Dr. Furze indicates she has been treating Plaintiff for depression since 2009.  (Tr. 495).

[10] Dr. Furze does not identify the type of surgery Plaintiff had.  The record reflects

and the ensuing lawsuit over her mother's estate, have "deepened [Plaintiff's] depression to the point where she is currently disabled." (Tr. 605).  Dr. Furze stated that "[a] major manifestation of [Plaintiff's] depression is neurovegetative cognitive functioning[,]" which causes her "to have great difficulty concentrating on minor tasks, organizing and motivating herself to accomplish minimal goals.  Ms. Hayden continues to have difficulty with routine hygiene and grooming, she has allowed her mortgage to move toward foreclosure four times in the past years, not because of financial deficit, but because of her impaired organizational functioning."  (*Id.*).  Dr. Furze also indicated concern that interaction between Plaintiff's RA and depression "is making recovery more difficult." (*Id.*).  Dr. Furze opined that it was unlikely that Plaintiff would return to work anytime in the foreseeable future.  (*Id.*).

In 2010, Dr. Furze submitted a form indicating that Plaintiff was disabled from performing her customary work due to major depression and cognitive neurovegetative symptoms of depression.  (Tr. 499; *see also* Tr. 498).  In 2011, Dr. Furze reaffirmed her opinion.  (Tr. 497).  In February 2013, Dr. Furze submitted Mental Work Tolerance Recommendations indicating that since 2009, Plaintiff had several limitations.  (Tr. 781-83).  Dr. Furze opined that in the area of understanding and memory, Plaintiff  was markedly limited in the abilities to understand and remember short and simple instructions as well as detailed instructions, and she was moderately limited in the ability to remember locations and work-like procedures. (Tr. 781).  In the area of concentration and persistence, Plaintiff was markedly limited in the abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule or maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; and complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without more than the normal rest periods.  (Tr. 781-82).  In that same area, Plaintiff was moderately limited in the ability to carry out short and

---

that Plaintiff had gallbladder surgery in August 2011.  (Tr. 318).

simple instructions, and she was mildly limited in the abilities to maintain attention and concentration for brief periods and to work in coordination with or proximity to others without being distracted by them.  (Tr. 781-82).  In the area of social interaction, Plaintiff was moderately limited in the abilities to: accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 782).  In that same area, Plaintiff was mildly limited in the ability to ask simple questions or request assistance, and she was not significantly limited in the abilities to interact appropriately with the general public and to get along with co-workers or peers with distracting them or exhibiting behavioral extremes.  (*Id.*).  In the area of adaptation, Plaintiff was: markedly limited in the ability to set realistic goals or make realistic plans independently of others; she was moderately limited in the ability to respond appropriately to changes in the work setting; and she was mildly limited in the abilities to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or to use public transportation.  (Tr. 783).  Dr. Furze pointed out that Plaintiff's "relative strength with respect to social interactions does not mitigate her impairments in memory, concentration, and planning which render her unable to work in any capacity at the present time.  The impact of her depression and resulting cognitive impairments is worsened by her chronic and multiple medical problems."  (*Id.*).

The ALJ found Plaintiff had no limitations in the areas of daily living, social functioning, or concentration, persistence or pace.  (Tr. 13)  Nor did he find that Plaintiff experienced any episodes of decompensation of an extended duration.  (*Id.*).  The ALJ did not cite Plaintiff's depression as a severe impairment.[11]  (*See* Tr. 12).  However, he

---

[11]  The determination whether an impairment or combination of impairments is severe is made at step two of the sequential process.  Step two "is 'a *de minimis* screening device [used] to dispose of groundless claims.'"  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290) (alteration in original).  "At step two, the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limits his ability to do basic work activities."  *Id.* (citing 20 C.F.R. § 404.1520(a)(4)(ii)).  Basic work activities include understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine

included in the RFC assessment that Plaintiff "must not work in a fast-paced production environment; and is able to attend and concentrate for 2 hour blocks of time throughout an 8 hour workday with the two customary 10 to 15 minute breaks, and the customary 30 to 60 minute lunch period." (Tr. 14).

The ALJ gave Dr. Furze's and Dr. Smith's opinions "little weight", finding they were conclusory, unsupported by clinical signs and findings reported in the case record, and that Dr. Furze's opinion was based primarily on Plaintiff's self-reports which the ALJ discounted upon his finding that Plaintiff was not fully credible. (Tr. 14). He also asserted that Dr. Furze's notes "contain[ed] few objective mental status examination findings…" and that both Dr. Furze's and Dr. Smith's opinions were inconsistent with mental status examinations showing Plaintiff had appropriate affect, logical thoughts and was cooperative, "and her relatively good activities of daily living discussed herein including her frequent travel between Arizona and California." (*Id.*).

After the ALJ issued his decision denying Plaintiff's application, Dr. Furze submitted a letter explaining that her conclusions are based on her clinical observations of Plaintiff's "verbal and cognitive functioning and speech during our sessions. These signs and observations include difficulty concentrating, difficulty finding words and maintaining a line of conversation or reasoning, apathy, anhedonia (inability to experience pleasure in normally pleasurable activities) emotional lability, and suicidal ideation." (Tr. 847). Dr. Furze also stated that "[c]linical depression does not make travel impossible, or even improbable, only more difficult." (Tr. 848). She also stressed that mental status examinations only focused on one point in time and that she routinely does not use treatment notes "as an ongoing documentation of symptoms for the patient.

---

work setting. 20 C.F.R. §§ 404.1521(b)(3)-(6). "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb,* 433 F.3d at 686 (quoting *Smolen,* 80 F.3d at 1290). In assessing the ALJ's finding that an impairment is not severe at step two, the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the plaintiff] did not have a medically severe impairment or combination of impairments." *Id.* at 687.

The absence of observations regarding functioning in my office notes did not mean that they were absent  in the patient.   In this case, the symptoms were not typically documented although, as shown in my reports, were ongoing in the patient."  (*Id.*). Although the Appeals Council considered Dr. Furze's letter, the ALJ's decision was upheld. (Tr. 1-4).

At the outset, Defendant is correct that Dr. Furze's statements that Plaintiff's depression is disabling, alone, are not binding.  *McLeod v. Astrue*, 640 F.3d 881, 884-85 (9th Cir. 2011)("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability."); 20 C.F.R. §§ 404.1527(d)(1), 404.1527(d)(3) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled[,]" and will not be given "any special significance…."). Instead, "an ALJ may reject a treating physician's uncontradicted opinion on the ultimate issue of disability only with 'clear and convincing' reasons supported by substantial evidence in the record.…If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physician's opinion." *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir. 2001).

Here, the record contains Dr. Furze's notes and explanations in support of her opinion. "The primary function of medical records is to promote communication and record-keeping for health care personnel—not to provide evidence for disability determination." *Orn*, 495 F.3d at 634; *see also Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly where the doctor did not discharge the claimant from treatment.").      Dr. Furze's notes, while rather disjointed, reflect Plaintiff's continued complaints of depression and hopelessness (Tr. 504 (March 2010); Tr. 503 (feeling very down in June

2011); Tr. 629 (October 2012); Tr. 628 (November 2012 "like I'm dying….'Don't do anything to sustain living'"); Tr. 627 (increased depression in December 2012), Tr. 627 (January 2013)); not being able to think (Tr. 504 (March 2010); Tr. 627 (trouble focusing in January 2013)); forgetfulness and needing to write things down (Tr. 606, 632 (April 2012); Tr. 629 (October 2012); Tr. 628 (November 2012); Tr. 627 (December 2012 and January 2013)); sleep issues including difficulty sleeping as well as hypersomnia (Tr. 506 (January 2012); Tr. 606 (April 2012); Tr. 630 (in October 2012 noting "[s]omatic distress" upon Plaintiff reports of "[h]ardly get[ting] out of bed. Not able to do anything."); Tr. 629 (on November 5, 2012 Plaintiff reported she spent "[a]ll day Sunday in bed.  Joints swollen."); Tr. 627 (on November 26, 2012 Plaintiff reported she was sleeping for 10 hours); Tr. 627 (December 3, 2012)); and suicidal thoughts (Tr. 504 (March 2010); Tr. 629 (October 2012)).  Plaintiff reported rarely leaving her house and showering infrequently.  (Tr. 629 (October 2012); Tr. 628 (reporting in November 2012 that she left the house only once other than to go to the doctors' appointments and she does not like going out); *see also* Tr. 627 (noting in January 2013 that Plaintiff was "disconnected socially.")).  In November 2012, Plaintiff told Dr. Furze that she had "'no plan to continue on the planet.'  Hit self on head—hurt.  Considered 'cutting' self. Started to try—self mutilation would feel good….I don't want to live like this."  (Tr. 628).  In December 2012, Plaintiff reported she was "still in a tailspin despite [increased] medication.  (Tr. 627; *see also* Tr. 640 (In December 2012, Dr. Smith increased Wellbutrin after the death of Plaintiff's father)).

Dr. Furze's notes reflect that Plaintiff had difficulty concerning mental organization and she was easily overwhelmed. (Tr. 629).  Dr. Furze's notes also indicate that she discussed methods to help Plaintiff with forgetfulness.  (Tr. 606  "Use external brain" *i.e.* notes to prompt self to daily tasks—*i.e.* shower, etc." and "Cont. CBM for routine func[tions and] exercise [increase] clarity of thoughts, [decrease] weight")).  Dr. Furze also discussed setting goals to get to sleep by midnight and to "get on 'normal' time schedule."  (Tr. 627 (December 2012); *see* also Tr. 628 (November 2012)).  They

also set a goal for Plaintiff to increase the times she left her house to every other day, even if only to walk around the block. (Tr. 628). Based on Plaintiff's treatment history, Dr. Furze wrote the undated letter indicating Plaintiff had "great difficulty concentrating on minor tasks, organizing and motivating herself to accomplish minimal goals[]" (Tr. 605) and assessed Plaintiff with several marked and moderate limitations in mental functioning (Tr. 781-83).

Although an ALJ may reject a treating doctor's opinion as based solely on the plaintiff's subjective complaints where the ALJ has set forth proper reasons to discount the plaintiff's credibility, *see e.g. Tonapeyton v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001), here, as discussed above, the ALJ failed to set forth sufficient reasons to discount Plaintiff's credibility. Moreover, there is nothing in the record to suggest that either Dr. Furze or Dr. Smith "disbelieved [Plaintiff's] description of her symptoms, or that [Dr. Furze and Dr. Smith]…relied on those descriptions more heavily than [their] own clinical observations in reaching [their] conclusion[s]…" regarding Plaintiff's limitations. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-200 (9th Cir. 2008) (citing *Regennitter v. Comm'r Soc. Sec. Admin.,* 166 F.3d 1294, 1300 (9th Cir.1999) (substantial evidence did not support ALJ's finding that examining psychologists took claimant's "statements at face value" where psychologists' reports did not contain "any indication that [the claimant] was malingering or deceptive")). Because the ALJ provided insufficient reasons to discount Plaintiff's credibility, he may not rely on that credibility assessment to discredit the treating doctors' opinions.

To reject Dr. Furze's and Dr. Smith's opinions, the ALJ relies heavily on Dr. Smith's reports that Plaintiff presented on many occasions with appropriate affect, logical thoughts and was cooperative. (*See* Tr. 14) The Ninth Circuit has recognized that "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms….They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that

a claimant can function effectively in a workplace" *Garrison,* 759 F.3d at 1017 (citations

omitted).  Moreover,

> [w]hen mental illness is the basis of a disability claim, clinical and
> laboratory data may consist of the diagnoses and observations of
> professionals trained in the field of psychopathology. The report of a
> psychiatrist should not be rejected simply because of the relative
> imprecision of the psychiatric methodology or the absence of substantial
> documentation, unless there are other reasons to question the diagnostic
> technique.

*Sanchez v. Apfel,* 85 F.Supp.2d 986, (C.D. Cal. 2000) (quoting *Christensen v. Bowen*, 633

F.Supp. 1214, 1220-21 (N.D.Cal. 1986) (quotation marks and citation omitted). Also of

significance is that Dr. Smith and Dr. Furze had been treating Plaintiff for some time

when they submitted their opinions.  *Orn,* 495 F.3d at 633  ("the treating relationship of

both [treating] physicians provides a 'unique perspective' on [Plaintiff's] condition".)).

The record reflects that during Plaintiff's course of treatment with Dr. Smith, he

continued to diagnose major depressive disorder and he prescribed Cymbalta and later

added Wellbutrin, and changed dosages of medication several times. (*See e.g.,* Tr. 246

(prescribed Cymbalta); Tr. 243 (increased Cymbalta); Tr. 242 (decrease Ambien,

continue Cymbalta); Tr. 241 (decrease Cymbalta per rheumatologist's request due to

possibly causing increase in RA symptoms); Tr. 240 (increase Cymbalta); Tr. 239 (add

Wellbutrin); Tr. 238 (medications include Cymbalta, Ambien, Wellbutrin and Ativan),

Tr. 640 (increase Wellbutrin)).   Additionally, consistent with Dr. Furze, Dr. Smith's

notes also reflect his observations of Plaintiff's depressive symptoms and continued

complaints of difficulty focusing and processing information (Tr. 246 (on September 24,

2009, Dr. Smith's impression was significant symptoms of major depressive disorder

"including…prominent cognitive complaints…" upon Plaintiff's complaints of difficulty

with concentration, decision making and processing information together with weight

gain, sleep issues, increased crying, and little pleasure); Tr. 243 (December 2009 note

indicating "mood better but cognitive [symptoms] still prominent"); Tr. 242 (January

2010 note indicating Dr. Smith's impression included:  "still significant" symptoms of

major     depressive     disorder     "especially     cognitive     complaints     and     poor

concentration/focus…."); Tr. 241 (Dr. Smith's February 2010 assessment included "tiredness and poor conc/focus"); Tr. 240 (May 2010 note of increase in symptoms of major depressive disorder)). Although Dr. Smith's notes beginning in October 2010 reflect that Plaintiff's symptoms were stable, Dr. Smith added Wellbutrin in March 2011 because he found her symptoms to be at a dysthymic level. (Tr. 239 (noting Plaintiff's report of low motivation and productivity)). In June and September of 2011, he found that although Plaintiff was generally stable, she presented as "flat". (Tr. 238).[12] In May 2012, upon Plaintiff's complaints of increased insomnia and poor focus, Dr. Smith adjusted her medication. (Tr. 599). Medication was increased again in October 2012 upon increased depressive symptoms due to grief associated with the death of Plaintiff's father. (Tr. 640 (also noting Plaintiff presented as "flat"); *see also* Tr. 639 (December 2012 note keeping Plaintiff on higher dose of Wellbutrin: "Generally more stable on higher dose Wellbutrin—has [symptoms] of bereavement since father passed away but less neurovegetative [symptoms].")). By February 2013, Dr. Smith noted Plaintiff's continued complaints of poor concentration and problems sleeping, and his impression was: "MDD: Higher stress related to recent medical problems. Worse sleep is notable and is affecting patient's functioning." (Tr. 638) He continued Plaintiff on Cymbalta, Wellbutrin and Ativan. (*Id.*). Also in February 2013, Dr. Smith wrote the Plaintiff met Listing 12.04. (Tr. 652).

---

[12] Consistent with the time period when Dr. Smith found Plaintiff was generally stable, a September 2011 record from Dr. Patel's clinic reflects that "[p]resently, [Plaintiff] denies any depressive symptoms. Current medications include Wellbutrin XL. Currently she is doing well without any significant affective symptoms. Presently, Ms. Hayden denies suicidal ideation." (Tr. 776; *see also* Tr. 779 (same treatment note reflecting that with regard to depression, "she is doing well on Wellbutrin")). Subsequent records reflect Plaintiff's report during 2011 through May 2012 to providers at the Patel Medical Clinic that her depression was "well controlled on medication…." (Tr. 756, 759 (although Plaintiff "seemed anxious"), 762, 765, 768, 771). The Ninth Circuit has recognized in the context of mental health issues that "[c]ycles of improvement and debilitating symptoms are a common occurrence….'[The treating physicians'] statements must be read in the context of the overall diagnostic picture he draws.'" *Garrison,* 759 F.3d at 1017 (quoting *Holohan,* 246 F.3d at 1205).

There is no indication on the record that the doctors reviewing Plaintiff's claim of mental impairment, to whom the ALJ attributed substantial weight, reviewed Plaintiff's medical records dated after January 2012.  (*See e.g.,* Tr. 91-92, 109-110 (both indicating date last insured of December 31, 2011)).  Nor do they refer to any records or assessments from Dr. Furze.  (*See e.g.* Tr. 91-92; Tr. 109-110).  Dr. Furze's records provide a broader picture of Plaintiff's alleged mental impairment and limitations and inform consideration of Dr. Smith's opinion, as well.  Yet, the records appear to have been overlooked by the nonexamining doctors.

Drs. Smith's and  Furze's records contain documentation to support the conclusion that Plaintiff is more limited than that determined by the reviewing doctors and the ALJ. As discussed above, the nonexamining doctors' opinions in this case, which appear to be based upon findings in Dr. Smith's records through January 2012 and no other clinical findings, cannot by themselves constitute substantial evidence upon which to reject Dr. Smith's opinion.  *See Orn,* 495 F.3d at 632-33; *Lester,* 81 F.3d at 831.  Upon full review of the record as discussed above, the Court concludes that the ALJ failed to set forth specific and legitimate reasons supported by substantial evidence of record for rejecting Drs. Smith's and Furze's opinions.  This error impacts the ALJ's analysis beginning at step two.

### D.    LAY TESTIMONY

Plaintiff submitted a letter from her former supervisor Normal Bell, who commented upon workplace accommodations provided to Plaintiff, finding her "stretched out on the floor, straightening her back…", and recurring mobility issues with her hands and fingers which limited her typing.  (Tr. 227).  The ALJ gave Mr. Bell's statements little weight because they were "based on what the claimant told him or displays for him, and the claimant is not fully credible…."  (Tr. 18).  The ALJ also stated that Mr. Bell's statements were contradicted by the objective evidence.  (*Id.*).

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account."

*Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir.2012) (citations omitted). To discount competent lay witness testimony, the ALJ must state reasons that are germane to each witness. *Id.* Because the ALJ failed to set forth sufficient reasons for finding Plaintiff not fully credible, his rejection of Mr. Bell's statement as based on Plaintiff's reports is without basis. As to the ALJ's finding that Mr. Bell based his comments on Plaintiff's "displays" for him, Plaintiff persuasively argues that she "was terminated in 2008 and she filed her application [for disability benefits] in 2011. Apparently, the ALJ believes that *at least four years* before she filed for disability, she was laying the groundwork for her case by faking back pain, getting down on the floor and stretching in front of her supervisor." (Doc. 14, p. 12). Further, the objective medical record supports Plaintiff's complaint of back issues, as well as pain and swelling in her hands and fingers which, in turn, support Mr. Bell's statements concerning Plaintiff's limited ability to type. The ALJ failed to set forth sufficient reasons to reject Mr. Bell's statement.

### E.   PLAINTIFF'S PAST RELEVANT WORK

The ALJ determined that Plaintiff could perform her past work as an research director (editor) and journalist. (Tr. 18-19). Plaintiff argues that the record does not support a conclusion that she ever worked as a journalist as that job is described by the *Dictionary of Occupational Titles* and that her past work as a research director, as she actually performed such work, is precluded by the ALJ's RFC assessment, which included limitations on sitting and use of her hands for fine manipulation.

Plaintiff bears the burden of establishing that she cannot perform her prior relevant work either as actually performed or as generally performed in the national economy. *Lewis v. Barnhart,* 281 F.3d 1081, 1084 (9th Cir. 2002); *see also* SSR 82-61, 1982 WL 31387, *1-*2. With respect to making vocational findings as to whether a claimant can perform her past relevant work, "the best source for how a job is generally performed is usually the *Dictionary of Occupational Titles.*" *Pinto v. Massanari,* 249 F.3d 840, 845 (9th Cir. 2001).

The Court agrees with Plaintiff that despite referring to herself as a journalist

during testimony (Tr. 44), the substantial evidence of record does not support the conclusion that Plaintiff's past work involved being a "reporter" as that term is identified in the *Dictionary of Occupational Titles* entry cited by the VE and ALJ. (*See e.g.,* Tr. 201-04, 113). While the Court agrees with Defendant that Plaintiff must show that she cannot perform her past relevant work as either actually performed or generally performed, the substantial evidence of record at this point, for the reasons stated above, does not support the ALJ's RFC assessment given his improper rejection of opinions from Plaintiff's treating doctors, Plaintiff's credibility and Mr. Bell's statements.

## V.   REMAND FOR FURTHER PROCEEDINGS

Plaintiff requests that the Court remand this matter for payment of benefits because "[t]he evidence in its totality demonstrates that [she] was and is unable to work…." (Doc. 18, p. 11; *see also* Doc. 14, p. 17). In the event the Court determines the ALJ's decision contains harmful error, Defendant requests that the Court remand for further proceedings. (Doc. 15, pp. 22-23).

"A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc., Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407. Remand for an award of benefits is appropriate only where the following three prerequisites are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[13]

---

[13] The Ninth Circuit has noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that

1   *Garrison,* 759 F.3d at 1020 (footnote and citations omitted).  In evaluating whether

2   further administrative proceedings would be useful, the court "consider[s] whether the

3   record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues

4   have been resolved, and whether the claimant's entitlement to benefits is clear under the

5   applicable legal rules." *Treichler*, 775 F.3d at 1103-04.

6        The Ninth Circuit has been clear that it is an abuse of discretion to remand "for an

7   award of benefits when not all factual issues have been resolved."  *Treichler,* 775 F.3d at

8   1101, n.5 (citation omitted).  Moreover, even when all three factors of the test are met,

9   the "district court retains the flexibility to 'remand for further proceedings when the

10  record as a whole creates serious doubt as to whether the claimant is, in fact, disabled

11  within the meaning of the Social Security Act.'"  *Treichler,* 775 F.3d at 1102 (quoting

12  *Garrison,* 759 F.3d at 1021); *see also Dominguez,* 808 F.3d at 407-08 ("the district court

13  must consider whether…the government has pointed to evidence in the record 'that the

14  ALJ overlooked' and explained 'how that evidence casts into serious doubt' the

15  claimant's claim to be disabled.")(quoting *Burrell,* 775 F.3d at 1141).

16       With regard to Plaintiff's statements about the limiting effects of her  impairments,

17  "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a

18  claimant or other witness does not, without more, require the reviewing court to credit the

19  claimant's testimony as true."  *Treichler,* 775 F.3d at 1106 ("a reviewing court is not

20  required to credit claimants' allegations regarding the extent of their impairments as true

21  merely because the ALJ made a legal error in discrediting their testimony.").   "The

22  touchstone for an award of benefits is the existence of a disability, not the agency's legal

23  error. To condition an award of benefits only on the existence of legal error by the ALJ

24  would in many cases make disability benefits…available for the asking, a result plainly

25  contrary to 42 U.S.C. § 423(d)(5)(A)."  *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th

26  Cir. 2015) (internal quotation marks and citations omitted). Thus, "only where 'there are

27

28       there are no outstanding issues that must be resolved before a determination of disability
         can be made."  *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292).

no outstanding issues that must be resolved before a determination of disability can be made,' do we have discretion to credit a claimant's testimony as true and remand for benefits, and only then where 'it is clear from the record that the ALJ would be required to find [the claimant] disabled' were such evidence credited." *Treichler,* 775 F.3d at 1106. (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir 2004)).

Plaintiff contends that, in light of the ALJ's failure to set forth sufficient reasons to reject Dr. Barry's restriction regarding telecommuting, Dr. Barry's opinion should be credited thus resulting in the award of benefits in light of the VE testimony. (*See e.g.* Doc. 14, p. 10). However, Dr. Barry wrote the letter in 2005, and even though Plaintiff points out that the Doctor never retracted the restriction, the record reflects that Dr. Barry based that restriction on Plaintiff's RA and "more recent[] chronic intermittent pleuritis", both of which caused "joint and chest pain intermittently". (Tr. 785). Dr. Barry acknowledged that the need for telecommuting "would vary depending on how [Plaintiff] responds to future treatments." (*Id.*). The record reflects Plaintiff's complaint of chest discomfort as late as July 2010. (*See e.g*., Tr. 545-46 (in July 2010, Plaintiff complained of "constant chest discomfort but no evidence of recurrent pleural effusion[]" and Dr. Lim[14] noted: "Stable, follow. Suspicious for pleuritic origin.")). However, by January 2011, Dr. Lim found "no recent exacerbations of pleurisy." (Tr. 542); *see also* Tr. 537 (a January 2012 note reflects "no recent exacerbations of pleurisy…", although Plaintiff had a mild respiratory infection)). In July 24, 2012, Dr. Lim wrote that Plaintiff "has a history of rheumatoid arthritis and recurrent bouts of pleurisy…the latter has not been problematic in quite some time." (Tr. 624)). Dr. Lim's July 24, 2012 note also reflects Plaintiff's report that "[h]er current immunosuppressive regimen has been working very well to control her rheumatoid symptoms." (*Id.*). Plaintiff contends she got worse after Dr. Barry's 2005 letter and cites to the addition of monthly Orencia infusions for that premise. (Doc. 18, p. 4). However, Defendant points out that in January 2013, Plaintiff reported significant improvement in her RA while on Orencia and that she was able to do

---

[14]Dr. Lim treated Plaintiff for pulmonary issues.

travel frequently to California.  (Doc. 15 p. 14; *see also* Tr. 623-24 (Plaintiff's report in July 2012 to Dr. Lim that her current immunosuppressive regimen, which included Orencia, had been working very well to control her RA symptoms); Tr. 779 (Plaintiff reported in September 2011 that she was "doing well on her current regimen" for RA, which included Orencia); *but see* Tr. 401-02 (Plaintiff's May 2010 report of significant increase in RA activity despite the Methotrexate and Orenica.  Arava was discussed); Tr. 654 (in January 2010, although Plaintiff reported doing "fairly well in terms of her RA", while on Orencia, she also complained of morning stiffness lasting from two minutes to one hour)).   Plaintiff did not testify about chest discomfort or chest pain at the hearing.  The matter of Dr. Barry's letter and impact of Plaintiff's RA and pleuritis during the time period at issue requires further exploration.

Additionally, the ALJ relied on opinions from nonexamining doctors whose opinions were based solely on a record review but who appear not to have evaluated portions of Plaintiff's medical record even though the records were before them due to their mistaken belief that Plaintiff's date last insured was fell in 2011 instead of 2013.  Apparently, because of the mistake concerning Plaintiff's date last insured, no consultative examination was conducted despite nonexamining Dr. Goodrich's observation that there were "no good functional examinations" in the record.  (Tr. 111).  *Cf. Penny,* 2 F.3d at 958 ("Without a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual.").   The ALJ's consideration of Plaintiff's limitations caused by RA overlooks the longitudinal picture of Plaintiff's continued complaints, especially with issues involving her hands and fingers which could very well impact the ALJ's RFC assessment and finding that Plaintiff could do past work.

With regard to Plaintiff's mental impairments, while the Court has set out reasons why the ALJ improperly rejected Dr. Smith's and Dr. Furze's opinions, Defendant persuasively casts serious doubt regarding the Doctors' opinions.  ***See e.g. Dominguez,*** 808 F.3d at 407.  Dr. Smith provided absolutely no explanation to support his brief statement that Plaintiff met Listing 12.04.  (*See* Doc. 15, p. 9 ("Dr. Smith does not even

identify which criteria in Listing 12.04 he believes Plaintiff satisfies.")).   Even assuming that Dr. Smith's sparse notes, which mention Plaintiff's continued symptoms from depression, support a finding under Paragraph A of the Listing, they do little to support the necessary findings for the Paragraph B criteria.   The same is true of Dr. Furze's notes with regard to her opinion expressed in her letters and her Mental Work Tolerance Recommendations.   Treatment notes from other providers indicating Plaintiff was well groomed (Tr. 743 747, 752, 755, 761, 770, 773, 778), conflict with Dr. Furze's statement that Plaintiff's depression interfered with routine hygiene and grooming.   Although Plaintiff cannot be faulted for retaining her long treatment relationship with doctors in California, the scheduling and travel plans associated with same arguably undermine  Dr. Furze's opinion that Plaintiff is significantly limited in areas such as organizing herself, understanding and remembering simple instructions, or using public transportation. Additionally, Plaintiff achieved a level of stability with her depressive symptoms for some time in 2011 and 2012 as reported by Drs. Smith and Patel.   While the Court recognizes that cycles of improvement must be read in the context of the overall diagnostic picture, the record suggest that Plaintiff's subsequent increase in depression in 2012 may have been situational in light of the passing of Plaintiff's father, as noted by the ALJ.  (Tr. 13).  Even Plaintiff has suggested that "a consultative examination…might have shed light on her psychiatric impairments."  (Doc. 14, p. 7).

For the above stated reasons, while the record strongly supports the conclusion that Plaintiff may have limitations caused by her mental impairment  that the ALJ did not include in the RFC assessment, inconsistencies and conflicts in the record preclude crediting Dr. Smith's and Dr. Furze's opinions at this point.   Additionally, further consideration of the impact of any limitations caused by Plaintiff's mental impairments on her ability to work may require exploration with a VE.   Moreover, even if Dr. Barry's, Dr. Smith's, and Dr. Furze's opinions, taken together or separately, satisfy the three preliminary requirements for awarding benefits, for the reasons stated above, the record as a whole creates serious doubt as to whether Plaintiff is, in fact, disabled under the

Social Security Act. Consequently, remand for an award of benefits in this case is inappropriate. *Brown-Hunter,* 806 F.3d at 496 (remanding to the ALJ on an open record for further proceedings where there is conflicting evidence and not all essential factual issues have been resolved); *Burrell,* 775 F.3d at 1142 (remanding to the ALJ on an open record where the record creates serious doubt as to whether the claimant is, in fact, disabled."). Instead, this matter shall be remanded to the ALJ on an open record for further proceedings. *See id.*

The Court is not unsympathetic to the fact that remand for further proceedings prolongs an ultimate resolution. As, the Ninth Circuit has stated: "While we have recognized the impact that delays in the award of benefits may have on claimants, such costs are a byproduct of the agency process, and do not 'obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.'" *Treichler,* 775 F.3d at 1103 (quoting *Harman v. Apfel,* 211 F.3d 1172, 1179 (9th Cir. 2000)).

## VI.   CONCLUSION

For the foregoing reasons, this matter is remanded to the ALJ on an open record for further proceedings consistent with this Order. Accordingly,

IT IS ORDERED that:

(1)   the Commissioner's decision denying benefits is REVERSED; and

(2)   this action is REMANDED to the Commissioner on an open record for further proceedings.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 25th day of March, 2016.

_____
Bernardo P. Velasco
United States Magistrate Judge

- 39 -